We will hear argument next in No. 22, 1711. Givaudan SA v. Conagen, Inc. Mr. Bernstein. May it please the Court. Jonathan Bernstein from Wilbur Segala for Givaudan SA. We seek a reversal of the district court's dismissal of the breach of contract claim, a reinstatement of that claim, a finding that there was a breach of contract, and then a remand for the issue on damages so that Givaudan can get its money back plus interest. So the first point I wanted to make is regarding – are you relying on this argument that Conagen breached the term sheet? I mean isn't your primary argument that the term sheet isn't even a contract at all and so they're not entitled to the $10 million under it? I believe that both parties agreed that the term sheet was a contract. Well, it's a contract, but you don't believe that it's a contract that effectuated a stock sale. It dealt with giving the 5% interest and also with the exclusive right to the IP rights, and it was a two-part deal. And where the breach of contract came in is that we never got the exclusivity to the IP, which was really the heart of it. I'm sorry. Do you think that you had a valid contract with Conagen effectuating a stock sale? It was an equity – a purchase of an equity interest. There was the July 2015 original stock sale of $10,000. I'm sorry, $10 million. I mean the second one. The second one was a differentiation because there was further discussions about additional equity going towards them, but in addition to that was going to be the IP, and that was really the heart of it. So your position is that there was going to be a further agreement that effectuated a stock sale and also dealt with all the IP, and the term sheet was not that. It was just an agreement to pursue that in principle, and so you never effectuated a stock sale. Is that not your position? Well, they gave them the $10 million in September, I believe, of 2016, and it wasn't until May of 2017 that they actually gave them the stock certificates. In between then there were negotiations about basically – About what the sale should look like, which suggests that the term sheet was not the contract of sale. Well, the term sheet was – I don't want to put words in your mouth, but I thought that that was your position, that it was not a valid contract. No, the position was that these were the essential terms that they agreed to. These were the background of the terms that were agreed to. There was no dispute that they gave them $10 million. There was no dispute that they gave them stock certificates, and there was no dispute that they agreed – So I'm sorry. So do you think – do you or do you not think the district court was wrong in concluding that the term sheet – key term one of the term sheet was a valid contract that effectuated a stock sale? I believe the district court did indicate that it was a valid contract. Where I think the district court erred – That effectuated a stock sale. But it's not just a stock sale. That's the point, is that the district court said term one is a stock sale. Term two deals with the exclusive rights to IP. They're separate and apart, and our argument is they're interchangeable with one another. Is there some ambiguity as to whether they're independent or interdependent? I don't think there's an ambiguity because if you look at the initial proposal that was supplied, by Conagin, which is on 740 of the record, actually – When you look at terms two and three together, it suggests that there will be an additional agreement to be reached. There was – yes, there were going to be additional agreements. There were going to be additional documentations. But – Doesn't that suggest that this was something that was independent and not dependent on term one? And in any event, the judge conducted a four-day bench trial, heard from the testimony, heard as to what the parties intended, and made findings of fact. There was a four-day trial. There was findings of fact. Where's the clear error in the findings of fact? I think the clear error is – Parson is out, saying that the IP and the sale are separate and apart. But that – your client sent an email. The way to make sure that these things are treated as dependent is to make one a conditioned precedent for the other and say, okay, we're going to negotiate this exclusivity agreement, and then we'll fund the equity purchase once that license is done. But your client does the exact opposite and says, I'm so gung-ho about this tie-up with you all that we're going to send the $10 million for the equity investment now, with or without the exclusivity being negotiated. But I think he's sending the $10 million because there's a guarantee that they're going to get exclusivity in the signed term agreement, where it says – There's an agreement to negotiate in good faith. There's an agreement to agree on licensing terms. Right, but I – they agreed that this is what they were going to get. How they were going to get it had to be further negotiated between the two of them. But I think this – But isn't that true also of the stock sale? I guess I'm kind of – I mean I read the term sheet. The term sheet says the parties currently envision that they will negotiate in good faith and enter into one or more agreements which will contain terms and conditions similar to those detailed below and other terms and conditions to be negotiated between the parties. As you explained just a moment ago, even after you tendered the $10 million, the parties were still negotiating over the terms of the stock sale, which suggests that a stock sale hadn't been consummated. So I – I mean I would have thought that your position – I thought it was your position before the district court was that you had never entered into an agreement to effectuate a stock sale. You had given an advance payment in the expectation that there would be a sale, but there wasn't. Is that not your position now? No, we did give an advance, yes. But what I'm saying, where this breach of contract came in is that we never got the exclusive IP rights. Originally it started out as a – Is there anything that says it was an advance or that it was conditioned on the IP? It was brought up in an email. I'm going to have to search. At the time of the – when it was negotiated and agreed to, was there anything that says this is an advance and it's dependent on us reaching a satisfactory agreement with respect to the IP? It's not in the term sheet. Okay. What I'm trying to get at is that – What about the other conditions of Key Term 1? It says the first sentence is giving an additional $10 million for an additional 5% of Conagen, but then it says Conagen will adjust its management structure to include legal finance and all of that.  And then sign confidentiality non-competing agreements. Was that ever done? Which was not. What? I'm sorry. I trailed off a little at the end. Oh, sorry. The second sentence of Key Term 1. Conagen will adjust its management structure to include legal finance, CSO and office, and regular managers, and securing confidentiality non-competing agreements from its CSO, Oliver Yu, and CEO Stephen Chen. Did you get those? What happened here is what Mr. Chen testified to at the trial on page A311 is that Jividen did send candidates over, three for the CEO position and one for the CTO candidate. But it never actually came to fruition. So they did start with that. So even the terms of Key Term 1 were not complete except for the first sentence, which is the transfer of the money. Correct. But you still think that you're still telling me that your position now is you did enter into a contract of sale for the 5% of Conagen? We entered into it for two parts, one for the 5% that they were giving us, but also for the exclusivity. And what happened was originally it said exclusivity, and then it changed to after they indicated that they were not Jividen, indicated that they were not going to invest in two additional companies, the position changed and it became will you get the right of first refusal? And that's not what was agreed to. Can we stick with Judge Mahashi's question about whether the second sentence of Key Term 1 gets performed or not? This sentence was confusing to me. Conagen will adjust its management structure to include legal and finance. They already have a lawyer. I won't tell you Ms. Yu is actively involved in these negotiations, so that's at least some legal. I guess you could debate whether she's management or not, but she's being entrusted with this deal. What remains unperformed in your view of Key Term 1? See, this is where I think we differ in that Key Term 1, the $10 million was given. They did give the stock certificates back in May of 2017. But what was not performed is Part 2, and Part 2 and Part 1 we're saying are together, and that's originally the way that it was presented when Conagen gave us the original agreement. So I guess the district court does two things. The district court says the term sheet is a binding contract that includes a contract of sale for stock. And below, you took the position that it did not do that because we're still negotiating over the stock later. But now what you're saying is the district court does a second thing, which is it also says that the term sheet did not conclude an agreement over the IP rights because that was yet to be negotiated. And that Key Term 1 is severable from the other key terms. You're now not challenging the district court's decision on the first issue. You're agreeing that the term sheet was an agreement that effectuated a sale of stock, but you think the district court was wrong to say that the first term was severable from the later terms? Right. Key Term 1, 2, and 3 are all together. Key Term 4, which dealt with investment in other companies, was the one that was severable. It's one that said they're separate and apart. And what I'm trying to indicate is that- I guess let's say I don't agree with you because I think that there was yet to be negotiated what the terms over the IP would be. But I read the term sheet as being you did think that it was all going to be some kind of a package deal. So that means Conagent didn't breach because the IP had yet to be negotiated. But you didn't actually agree to transfer the stock until all of that was settled. Could you get judgment in your favor under that? Or your whole case depends on them breaching an agreement over the IP rights? Our appeal deals with them breaching the IP rights. That what we asked, what we bargained for was exclusive rights. What they changed the tables on us and started saying to us, no, we'll give you first right of first refusal. We'll give you first in line, right of first refusal. Those were not the same things. Getting in line and being the first one to offer money to get the IP that we wanted was not what we agreed to. We agreed that we'd have the exclusive right to this. That is the breach. And when they started indicating that, those terms, that was where the bad faith comes in. Well, so in the term sheet, you know, it says it talks about using reasonable efforts to commercially exploit mature IP. But it doesn't say anything about, you know, early stage IP, right? Well, the first part says. Cogent will provide good value with exclusivity to Cogent's specified IP, including sweeteners, either in concept or mature for FNF. Exclusively will convert to non-exclusive. They should fail to use reasonable efforts to commercially exploit mature IP. But you're saying that because that first sentence says that there's no room for negotiation of what the conditions would be for the early stage IP. You're supposed to get it without conditions. We're supposed to get it without conditions, right? And we didn't do that. And then the record shows that it's bad. But doesn't the record show that, you know, the parties were negotiating over it? I mean the term sheet is just a term sheet to decide what the final agreement is going to look like, right? Well, the term sheet is the backbone of the agreement. I mean if I agree to turn up. Term three says the parties will agree on licensing terms. Doesn't that suggest that there's supposed to be more to come? They've got to negotiate and come to an agreement. Right. They do still have to negotiate on the other things. But the one thing that they did agree on was that we would get these exclusive rights. Can I just – let me assume for the moment that I agree with you that the APLE breached key term three. Key term three is an agreement to negotiate in good faith the terms of the IP licensing. The one thing that's locked down in this term sheet is that Javadin, or however you pronounce that, is going to get exclusive rights to this IP for 12 months, at which time we're going to measure whether they've commercially exploited it to an industrially viable extent. And they come back and say, we don't want exclusivity, we want a roofer. The question is, what is the remedy for the breach of key term three? And is key term three separable from key term one? What is the remedy? You foreswore expectation damages, according to the judge below at least, and said we just want our out-of-pocket expenses. You're saying – you're not damaged. You spent $10 million for equity that was worth $10 million, so that's not out-of-pocket damages. What is the right remedy for a breach of key term three, if you're right? The remedy we sought was very simple. Just give us our money back. Get us out. Give us the interest. And you would give the securities back, too. Yeah. You would unravel the transaction. That leaves me a little puzzled because, again, you had an argument before the district court that the whole thing was not a completed transaction. It was just a term sheet. And that would be an argument for unraveling the transaction. But now you're saying that actually it was a contract, and it's breached because the other party didn't negotiate in good faith over IP rights, and you've been damaged to the extent of $10 million. We didn't get the benefit of our bargain. So just give us our money back. We'll part ways, and that would be the end of it. I see I'm out of time. Okay. Thank you. Mr. Bernstein, you reserve time for rebuttal. We'll hear from the appellee. Mr. Black. May it please the Court. Answer your first question. Below the position that both parties took was that even though this is a one-page term sheet with terms that are open to negotiate, both parties took the position that it was a binding contract. The district court so found you will not find in the proposal. Well, it is a binding contract to negotiate in good faith, right? It is a binding contract with respect to all terms. Term one had certain conditions that were actually met by the parties. The $10 million was paid, which, as you pointed out, is quite unconventional. There's not actually an intent to have a contract. They paid the money. We gave them the equity. And the rest of the terms were to be negotiated in good faith. But it doesn't say that. It doesn't say key term one is a binding contract that's done and the rest are to be negotiated. It says everything is to be negotiated, right? It says if the parties currently agree that they will negotiate in good faith and enter into one of our agreements to cover the terms below. So there's no distinction between key term one or two or three or four. The one distinction between key term one and the other terms, which the district court found that is clear from the language, is the key term one is immediately executable, was, in fact, executed by the parties. The chairman of Jividan induced Conagin to enter into this contract by promising in an email that went with the term sheet by saying, I will effect the equity transfer immediately. The evidence shows that internally Jividan understood that they bought the equity. One fact that's in the record. But, I mean, even after he transfers the $10 million, the parties are still negotiating what the stock sale is going to look like, right? Correct. So if they thought that they had completed the transaction over the stock sale, why would they still be doing this? There are potentially additional conditions that could have been put on return of rights to sell the stock later. But you have to understand the parties already had entered into a 26-page agreement on the first 5% of the equity. And, therefore, there really wasn't that much to discuss. There were no negotiations over that term, over the stock purchase agreement, and none has been asserted to be a breach. We have to take the plaintiff's case as they put it in the complaint. They did not plead that this was not a contract. They did not plead rescission. We would have a lot of answers to those things. But they didn't do that. What they said was that there was a breach of the duty of good faith on the other terms and that that somehow resulted in damages. Well, they had an adjustment claim before the district court, right? I mean, so they do say, you know, we didn't effectuate a stock sale and you kept our money. We gave you an advance and you kept our money without completing the transaction. No, they did not plead the case that way. The only breach that's asserted in the breach of contract claim in the complaint or in the post-trial finding was the breach of the duty to negotiate good faith over the IP term. And the problem with that claim was, first of all, it's inherently a factual-based issue. The judge heard evidence. He concluded that the parties had not acted in that way. No, but it's a fact-based issue that's, you know, pretty much limited to the four corners of this term sheet. And I have to say, from my perspective, when party A says to party B, we would like to be the exclusive seller of your products or marketer or developer of your products within a given territory or for a given time, I understand that very differently as a matter of common usage than you'll get a right of first offer or a right of first refusal. So two points, Your Honor. First of all, the provision here doesn't say all IP that you own. It says specified IP, including sweeteners, which was to be negotiated. The testimony of the trial was that Jivinai never got around to specifying the IP. No, I understand that. So yes. Nobody finished the contract and there were material terms still to be negotiated, but the question is for me right now whether you negotiated in good faith or in bad faith. And if you've already promised, look, however we define the specified IP, your rights to it are going to be exclusive for 12 months unless you fail to commercially develop it, why isn't it bad faith for you to come back and say, we don't want to give you an exclusive right to this for any period of time. We'll give you a first look and you can either beat competing offers or not. So what the district court found, Your Honor, was that things are a little bit more complicated than that, that no one identified the specified IP, so they didn't know what was going to be part of the contract. These other terms are unclear and had to be negotiated. But more importantly, Jivinai was given the right. If we have early stage, really early stage stuff, we'll let you take a look at it, but we would like you to commit to whether or not you're going to be interested in it. The result of doing the contract the other way is that Jivinai would have had a veto right over everything the company did. This is an IP company-based company. That's what they did. The term sheet says in concept or mature, right? So in concept, that subsumes that whole spectrum. Yes, there are things that are before concept. There are things that are mature. None of these things were defined. Okay, so the things that are before concept are going to be excluded because we're talking about only in concept or mature. And they get the right to use it for 12 months, and if they fail to commercially exploit it, then you get it back. In addition, Your Honor, you're stopping the negotiations at the time that the first set of agreements went across from Ms. Yu in October. After that, Ms. Yu took a position. Mr. Garvano took a position. The lawyers got locked. What the testimony showed at trial is that Mr. Chen, who was the president, spoke directly with Mr. Graber and with senior executives, and that they continued in further discussions in the coming – through the next several months until about April when Jivinai just cut off the negotiations. Now, Judge – Because your client was insisting on a ROFO or ROFR instead of real exclusivity. That's not clear from the record, Your Honor. There are discussions that were continuing to go on, and it's not a ROFR of the kind that you normally have where it's somebody comes to the company and says, I want to do this project, and I'll pay you 5 percent, and then you give a right of first refusal. This was a situation where if they had an idea, Jivinai could say – Jivinai's position was that they could say, no, we don't want the idea, you cannot do it, you can never do it, we will never fund it no matter what. No, you couldn't not ever do it. You had to wait 12 months to see if they commercially exploited it. If it was a concept, if it was a very early concept, what this involves is genetically engineering microorganisms. You don't know what's going to work, what's not going to work. That Jivinai would never commit to either let us do the things that we needed to do. If they were not interested, fine, or we could move on. Is that exclusivity? Maybe that means you can debate what the specified IP is and maybe you can explain something. Yes. But if this sentence is binding, Conagin will provide Jivauden with exclusivity to Conagin's specified IP, including Sweetener's, either in concept or mature. Then doesn't that mean you've agreed to at least give them some exclusivity rights to an IP that's in concept? Yes, and they were negotiating towards that, but they were never able to reach an agreement. But if you say we're going to give them just a right of first refusal, isn't that not giving them an exclusivity right to the – No, it's exclusivity for a period of time until Jivauden says no. Was there an exchange of a draft exclusivity agreement? There was a draft exclusivity agreement provided by us before the term sheet, which had – There were discussions and communications about exclusivity for a period of time. Yes, there were, for several months, and the district court found that those were made in good faith. The requirement here is that to prevail on a claim like this is that you show not just bad faith, but bad faith and moral ubiquity. And even if you were to go that far and say the district court who heard the evidence and heard the parties and heard other evidence in the case about their theft of our confidential information and giving it to a third party about their refusal to negotiate over the other agreements, you'd still have the problem of damages here because they put the case as a reliance, reliance damages, and they don't have any damages because the district court correctly found that they got fair value for what they provided and didn't produce any evidence otherwise. The briefing on appeal is sparse on that point. That point is uncontested, and it's dispositive. Our position, Your Honor, is that the judgment should be affirmed. District court held a four-day trial. He heard the intent of the parties. He heard directly from the negotiators, and he reached a correct decision. What's the evidence from the four-day trial on what exclusivity means? It's just what the parties say they understood it to mean? There's no extrinsic evidence of that, right? There's no. There's the statements of the parties who testified at the trial regarding their intent, and there's no specific document that says exclusivity means X in the context of the term sheet. It was to be negotiated by the parties. We offer them exclusivity on certain things. We offer them exclusivity in the form of a right of firm. So why shouldn't we just interpret that according to the common usage and dictionary definitions of the term exclusivity? For one thing, Your Honor, this term sheet has to be considered as a whole, and at the beginning of the term sheet, it says that the parties envision that they will negotiate in good faith and enter into one or more agreements, which will contain terms and conditions similar to those detailed below. Yeah, but that ship has sailed, right? It seems like you all agree that at least Key Term 1 effectuated the substance of what it describes. So isn't that how we should read the rest of the contract too? You should read the rest of the contract, but you can't change $10 million for— You're saying this second paragraph applies to Key Terms 2 through 6 but not to Key Term 1. But you're already carving out— No, I'm not saying that. I'm saying when you're interpreting a duty to negotiate, you have to start with the words of the contract, and what's good faith or bad faith is going to be determined based on the words in the contract. If we had come back and said we're not going to sell you the stock for $10 million, we're going to sell it to you for $100 million, which is what happened in the SIGA tax case, that would be evidence of bad faith. But when a term sheet says similar terms, and you have terms that are open-ended like 2, 3, and 4 that require substantial negotiation, the parties have the ability to negotiate through these issues and find a fair resolution without— Well, you can say that it's subject to further negotiation, but you can also understand Key Term 1 is subject to further negotiation, right? Maybe they're not happy with the adjustments to the management structure and so on. Maybe they want to adjust the price. It doesn't seem to me if they expected that they weren't going to get the exclusivity rights that they bargained for, why would they still want to pay $10 million for an additional 5%? Well, there was no testimony on that, and the perplexing thing here, it's made pure perplexing to you, is why did they pay the money up front? And the reason we believe—Chairman Whitner didn't testify. He had left the company in the middle of this process, which is probably what caused the negotiations to go sideways, and they didn't call him to testify. Now, he agreed to pay the $10 million up front. He wanted to lock up the 5% interest. He got the stock. He got the extra equity, and he told the board that we completed that part of the transaction. The rest had to be negotiated. Well, how long was it between when he said the $10 million and you said the stock certificates? It was a couple of months. The agreement was September. The stock certificates were sent over in May, and they've never returned them. So they've had the benefit of the bargain all this time. There are no damages. There's no expectation damages. It's not a case of reliance damages. They've lost nothing. On that basis alone, you should affirm. Thank you. Okay, thank you very much, Mr. Black. We'll turn it back to Mr. Bernstein on rebuttal. Just real quick. Obviously, we didn't get the benefit of the bargain because we just, as of today, still don't have the exclusivity. But what this case really turns on when you get to the bad faith is that the parties negotiated 1, 2, 3, and 4 and said number 4, dealing with investments in the other companies, were separate and apart. In November of 2016, when Givenon indicates that it's not going to invest in the other two companies, at that point in time is where Carnegie says, okay, you're not getting exclusivity. You're getting first right refusal. And that's in the record on A623, A634, and A636. So all of a sudden, they now read the terms all together, even though now they're saying that they're separate and apart, when that's not the position that they took as soon as it became apparent that Givenon was not going to invest in the other companies. Can I ask you about paragraph 11 in the district court's order? The district court says you expressly disclaimed expectation damages. You're asking exclusively for reliance damages. What are your reliance damages? I think the reliance is that we gave $10 million with the impression that we would get the exclusivity, and that's why the simple remedy that we were asking for was just the money back was interesting. So basically to pay rent on the money that we gave them up front. And you're damaged why? Because you're stuck owning a 10% stake in a company that you don't want to be an owner of? Yeah, we're stuck with a stake, at least a 5%. The other 5% is going to stay. That's not what the part of this case was about. But because we didn't get the benefit of the bargain. We didn't get the IP that we asked for. Because the contract implies that you're spending $10 million not just to get 5% but also to get all of the IP rights. Correct. So you could also get back – so you're harmed to amount less than $10 million because presumably the 5% is worth something to you. Well, I don't think there was any evidence at trial about what the actual 5% is worth. Well, it's just about how you bargain. So if we understand the contract to be one total contract, you're spending $10 million for 5% plus the IP rights. It's not $10 million for the IP rights or $10 million for the 5%. So there must be some division of value between the two elements, right? Well, we don't know what the actual value would have been of the IP rights because we never got them. So that's why I'm saying that the easiest way to do this, the best way to do this is just give us our money back. They can find another 5% investor. Okay. Thank you very much, Mr. Bernstein. The case is submitted.